JASON H. LEE (Cal. Bar No. 253140)
DAVID ZHOU (NY Bar No. 4926523)
NATASHA BRONN SCHRIER (Cal. Bar No. 321728)
   bronnschriern@sec.gov
DUNCAN C. SIMPSON LAGOY (Cal. Bar No. 298776)
   simpsonlagoyd@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 700
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>        vs.<br><br>KENNETH MATTSON,<br><br>                Defendant,<br>        and<br><br>KS MATTSON PARTNERS LP,<br><br>                Relief Defendant. | Case No.<br><br>COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### SUMMARY OF THE ACTION

1.      From approximately 2007 through April 2024, Defendant Kenneth Mattson ("Mattson") orchestrated a Ponzi-like scheme that involved offering and selling fake interests in various legitimate limited partnerships created and managed by his company LeFever Mattson, a California corporation ("LeFever Mattson").  In the last five years alone, since around January

2020, Mattson fraudulently raised more than $46 million from approximately 200 investors, many of whom were retired senior citizens that Mattson met through his church community.

2.     The limited partnerships in which Mattson purported to sell interests (the "LeFever Mattson-affiliated limited partnerships") were real and invested in residential and commercial real estate.  The LeFever Mattson-affiliated limited partnerships were managed and partly owned by LeFever Mattson, a Citrus Heights, California-based company, which Mattson co-founded and ran as both the entity's chief executive officer and chief financial officer.  LeFever Mattson has been in business since 1989 and boasted an approximately $400 million portfolio of real estate investments, most of which consisted of ownership interests in 50 limited partnerships.

3.     While the LeFever Mattson-affiliated limited partnerships were real, and were in fact owned by a defined set of real investors, Mattson fraudulently raised funds from another set of investors by falsely purporting to sell them ownership stakes in those same LeFever Mattson-affiliated limited partnerships.  Mattson falsely told the defrauded investors that their investments would buy them a portion of LeFever Mattson's ownership interests in specific LeFever Mattson-affiliated limited partnerships and would entitle them to proportional distributions of the income generated by the underlying properties.  These lies were material to investors.

4.     Mattson took deceptive steps to hide his fraudulent scheme from people associated with LeFever Mattson, including by using a personal post office box to receive documents from investors, receiving investor funds and sending purported distributions from a bank account in the name of LeFever Mattson that only Mattson could fully access, and instructing his personal assistant not to discuss the defrauded investors with anyone else at LeFever Mattson.

5.     Mattson also kept documents related to his fraudulent scheme, including commercial bookkeeping records, on his laptop, and he deleted those documents after receiving an investigative subpoena from the staff of the Commission's Division of Enforcement that required him to produce certain records concerning, among other things, the LeFever Mattson-affiliated limited partnerships.

6.     Because he concealed his fake limited partnership sales from people associated with LeFever Mattson, the fake sales were not reflected in the legitimate records demonstrating ownership percentages of the LeFever Mattson-affiliated limited partnerships.

7.     As a result, the investors who purchased the fake interests in certain LeFever Mattson-affiliated limited partnerships from Mattson never became actual limited partners or acquired any actual ownership interests, and they never received legitimate distributions from the limited partnerships in which they thought they invested.

8.     Instead, Mattson commingled new investor funds with other personal and business funds in a bank account that he controlled and used the commingled funds to make Ponzi-like payments to existing investors.  He also misappropriated investor money to fund certain real estate transactions through his personal partnership, Relief Defendant KS Mattson Partners LP ("KS Mattson Partners"), pay expenses of KS Mattson Partners, and pay for personal expenses.

9.     Mattson concealed from investors the fact that he was orchestrating a Ponzi-like scheme by, among other things, using some new investor funds to make payments to deceive existing investors, and providing investors with altered limited partnership documents.  Mattson also prepared a separate set of false tax records for the defrauded investors, which contradicted the legitimate annual tax filings for the LeFever Mattson-affiliated limited partnerships that he signed and submitted to the Internal Revenue Service ("IRS").

10.     LeFever Mattson discovered Mattson's misconduct in late 2023.  In around April 2024, following an internal investigation, Mattson resigned from his positions as chief executive officer and chief financial officer, although he remains a significant owner of the company.  Later, in September 2024 and October 2024, LeFever Mattson and all of its affiliated limited partnerships filed for Chapter 11 bankruptcy protection.

11.     As a result of the conduct alleged in this Complaint, Defendant Mattson violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") as well as the securities registration provisions of the Securities Act.  Relief Defendant KS Mattson Partners was unjustly enriched by Mattson's violations.

12.     In this action, the Commission seeks against Defendant Mattson a permanent injunction, disgorgement of ill-gotten gains with prejudgment interest, and civil monetary penalties.  The Commission also seeks an order prohibiting Mattson from serving as an officer or director of a public company as well as from participating in the issuance, purchase, offer, or sale of any security.  Additionally, the Commission seeks disgorgement of ill-gotten gains with prejudgment interest from Relief Defendant KS Mattson Partners.

## JURISDICTION AND VENUE

13.     The Commission brings this action and this Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

14.     Mattson, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

15.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because acts, transactions, practices, and courses of business that form the basis for the violations alleged in this Complaint occurred in this District.  In addition, venue is proper in this district because Mattson resided in Alameda County and Sonoma County during the conduct alleged in this Complaint.

## DIVISIONAL ASSIGNMENT

16.     Under Civil Local Rules 3-2(d) and 3-5, this civil action should be assigned to the San Francisco Division or the Oakland Division because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Napa County and Sonoma County.

## DEFENDANT AND RELIEF DEFENDANT

17.     Defendant **Kenneth Mattson**, age 63, is a resident of Piedmont and Sonoma, California.  He was the CEO and CFO of LeFever Mattson from 1989 until April 2024.

18.    Relief Defendant **KS Mattson Partners LP** is a California limited partnership with its principal place of business in Vacaville, California. KS Mattson Partners is owned 49% by Mattson; 49% by Mattson's spouse; and 2% by KS Mattson Company LLC, Mattson's wholly owned limited liability company.

## RELATED ENTITIES

19.    **LeFever Mattson, a California corporation**, is a California corporation with its principal place of business in Citrus Heights, California that primarily creates, manages, and holds ownership interests in 50 limited partnerships, which, in turn, own and invest in residential and commercial real estate. Mattson and a business partner each own 50% of LeFever Mattson.

20.    **Home Tax Service of America d/b/a LeFever Mattson Property Management** ("Home Tax") is a California corporation with its principal place of business in Citrus Heights, California. Home Tax has approximately 40 employees who manage the business of the LeFever Mattson-affiliated limited partnerships. LeFever Mattson owns approximately 66.67% of the equity of Home Tax.

## FACTUAL ALLEGATIONS

### A.    Background on LeFever Mattson and Its Affiliated Limited Partnerships

21.    LeFever Mattson's primary business involves forming and acting as the general partner of 50 limited partnerships that purchase and invest in real estate. LeFever Mattson maintains an ownership interest in each limited partnership for which it acts as general partner.

22.    During his tenure as LeFever Mattson's CEO and CFO, Mattson primarily was responsible for finding real estate investment opportunities and soliciting investors to contribute capital to fund real estate purchases.

23.    After LeFever Mattson decided to buy a specific property, it formed a limited partnership, which was the entity that made the purchase and also served as the owner of the property. A group of initial investors, which included LeFever Mattson, provided the funds necessary to buy the property. The initial investors, who became the limited partners, then split up and proportionally allocated 100% of the limited partnership interests based on the amount of each

investor's capital contribution.  The percentage ownership of each limited partner was recorded in a document titled "Schedule A," which was attached to the limited partnership agreement.

24.     LeFever Mattson has no employees.  It relied on an affiliated property management company, Home Tax, to manage the limited partnerships.  Of particular relevance to this Complaint, Home Tax was responsible for maintaining and updating the limited partnership agreements as well as the attached Schedules A.

25.     After a limited partnership was formed and the limited partnership interests were fully distributed among the initial investors, there was no opportunity for new investors to join the limited partnership unless they purchased an interest from an existing limited partner.  On a number of occasions, LeFever Mattson or KS Mattson Partners bought out a limited partner in one of the limited partnerships and thereby increased its ownership share; in certain other cases, LeFever Mattson sold portions of its own interests in particular limited partnerships to new or existing investors.

26.     In these legitimate transactions involving LeFever Mattson and KS Mattson Partners, Mattson coordinated the signing of an "Agreement of Transfer and Purchase of Partnership Interest" (a "transfer agreement") by the buyer and the seller that specified the percentage interest that was being transferred.  Mattson then sent the signed transfer agreement to Home Tax, and Home Tax updated the relevant limited partnership's Schedule A and other internal records to reflect the change in limited partners and their respective ownership percentages.

27.     Each of the LeFever Mattson-affiliated limited partnerships is regulated by the California Department of Real Estate, and is required by state law to use a separate trust account to collect rental income for the limited partnership and to distribute funds to its limited partners. Home Tax was responsible for opening the separate accounts and distributing funds.

28.     The distributions to limited partners were made at the discretion of the general partner, LeFever Mattson, but, typically, limited partners received a 6% to 8% annual return on their investments.  At times, certain limited partnerships, at the direction of Mattson, bought or

sold real estate, which resulted in additional income for that particular limited partnership.  When those transactions happened, Home Tax increased the distribution to the relevant limited partners.

29.     Each LeFever Mattson-affiliated limited partnership is required to file a partnership tax return with the IRS on a Form 1065.  As part of that process, the limited partnership must send each of its limited partners a Schedule K-1 showing the limited partner's share of profits, losses, and capital.  In addition, on the Form 1065 itself, the limited partnership has to identify the number of limited partners that it has and attach each Schedule K-1.  The Form 1065 partnership tax returns were primarily prepared by an employee of Home Tax, but were reviewed and signed by Mattson.  After Mattson reviewed a Form 1065, including the associated Schedules K-1, Home Tax sent out the Schedules K-1 to the real limited partners.

### B.     Kenneth Mattson Defrauded Investors by Selling Fake Limited Partnership Interests

30.     In the last five years alone, Mattson sold at least $46 million of fake interests in LeFever Mattson-affiliated limited partnerships to approximately 200 investors throughout the United States, including many in the San Francisco Bay Area.  Mattson met many of the defrauded investors through his church, where several of the investors were also members.  A majority of the defrauded investors are over age 65, and many are retired.  Some invested their life savings with Mattson.

31.     Mattson's fraudulent Ponzi-like scheme took two main forms, but the general contours were the same for both:  Mattson held himself out to potential investors as the CEO of LeFever Mattson, and he offered them the opportunity to purchase interests in certain LeFever Mattson-affiliated limited partnerships from LeFever Mattson.  He had the investors sign what appeared to be limited partnership agreements and other related documents, and he accepted their funds.  However, Mattson did not record these purported sales in LeFever Mattson's books and records, or submit the signed documents to Home Tax so that the Schedules A and other limited partnership records would be updated.  As a result, the defrauded investors never became limited partners or acquired any ownership interests.

32.     To continue his deception, Mattson made payments to the defrauded investors that he mischaracterized as limited partnership distributions from a bank account that was held in the name of LeFever Mattson, but over which only he had control (the "Mattson Controlled Account"). He also created and provided the defrauded investors with fake Schedules K-1 that purported to show their financial interests in their specific limited partnerships.

33.     In one iteration of Mattson's fraudulent scheme, Mattson made false offers and sales of LeFever Mattson-owned interests in about 25 different LeFever Mattson-affiliated limited partnerships to at least 120 defrauded investors.

34.     In the other version of his fraudulent scheme, Mattson helped approximately 180 defrauded investors (some of whom also purchased fake interests in other LeFever Mattson-affiliated limited partnerships) change their individual retirement accounts ("IRA") so that they could use their IRA money to make purported investments in one particular LeFever Mattson-affiliated limited partnership called Divi Divi Tree LP (the "Divi Divi LP").

### 1.     *Mattson's False Offers and Sales of Interests in LeFever Mattson-Affiliated Limited Partnerships*

35.     Mattson's false offers and sales of LeFever Mattson's interests in certain limited partnerships raised at least $30 million from January 2020 through March 2024.

36.     Mattson negotiated these sales himself, often during in-person meetings with the investors. Some meetings took place in the homes of the investors. In most cases, Mattson presented the investor with a limited partnership agreement for a particular LeFever Mattson-affiliated limited partnership that stated the investor would be a limited partner and would receive distributions commensurate with the investor's ownership interest. Typically, Mattson, claiming to act on behalf of LeFever Mattson, and the investor both signed the limited partnership agreement during the in-person meeting. Mattson also often falsely represented that the distributions would result from rental income or profits from real estate transactions involving the property owned by the limited partnership. Moreover, Mattson usually had the investor sign a transfer agreement that purported to identify the percentage of partnership interests being transferred.

37.     The defrauded investors wired money to, or gave Mattson checks that were deposited into, the Mattson Controlled Account.  All the investor funds were paid into the single Mattson Controlled Account without regard to the specific limited partnerships that investors were supposedly investing in.

38.     Mattson knew, or was reckless in not knowing, that he did not follow LeFever Mattson's well-established internal steps to inform Home Tax about the purported sales of partnership interests and to have the sales recorded.  Indeed, he did not provide the signed limited partnership agreements and transfer agreements with the defrauded investors to Home Tax.  As a result, Home Tax did not list the defrauded investors on the appropriate Schedules A for the limited partnerships that they had supposedly joined as limited partners.  Mattson, who did send this documentation to Home Tax following his legitimate transactions on behalf of LeFever Mattson or KS Mattson Partners, hid his false sales from Home Tax.

39.     Mattson also knew, or was reckless in not knowing, that his concealment of the sales meant that the new investors were not receiving distributions from the specific trust accounts for their limited partnerships, as required by California law.  Instead, for any purported income distributions, Mattson used newly invested funds that had been commingled with other funds in the Mattson Controlled Account to make Ponzi-like payments to existing defrauded investors.  Mattson knew, or was reckless in not knowing, that these payments were not true distributions because, as both the head of LeFever Mattson as well as the owner of KS Mattson Partners, he regularly received legitimate limited partnership distributions from Home Tax through the applicable limited partnerships' separate trust accounts.

40.     Mattson did not tell investors that he would hide their investments from Home Tax and others associated with LeFever Mattson, or that they would receive purported distributions directly from Mattson rather than the limited partnerships that they invested in.

41.     Every year, Mattson prepared false Schedule K-1 tax documents for certain of the defrauded investors that purported to show the percentage of the limited partnerships owned by the investors.  Because Mattson also reviewed and signed the legitimate Form 1065 and Schedule K-1 documents submitted to the IRS, which did not list the defrauded investors as limited partners,

Mattson knew, or was reckless in not knowing, that the defrauded investors did not actually own interests in any of the LeFever Mattson-affiliated limited partnerships and that the Schedules K-1 provided to the defrauded investors contained false information.

### 2. *Mattson Obtained IRA Retirement Funds from Investors in Exchange for Fake Divi Divi LP Interests*

42.     In addition, Mattson made material misrepresentations to defrauded investors who used their IRA retirement money to purchase fake interests of Divi Divi LP.  In total, over the last 18 years, Mattson sold at least $55 million of fake Divi Divi LP interests to more than 180 investors, and, in the last five years alone, he sold around $16 million of fake Divi Divi LP interests to approximately 75 investors.

43.     IRAs are a type of retirement account that provide investors with certain tax benefits for retirement savings.  Generally, IRAs maintained and managed by major financial institutions and brokerages are limited to holding stocks, mutual funds, and bonds.

44.     In order to invest in less common assets, investors must open so-called self-directed IRAs.  The companies that act as custodians for self-directed IRAs permit accountholders to invest in a wider array of assets, including real estate, promissory notes, private placement securities, and limited partnership interests like the ones at issue in this Complaint.  Investors who have existing IRAs invested in equities and bonds can roll over their funds into self-directed IRAs.

45.     As part of his fraudulent scheme, Mattson solicited investors to transfer funds from their existing IRAs to self-directed IRAs in order to invest in interests of Divi Divi LP.  Mattson falsely told investors that they were purchasing interests from LeFever Mattson, which owned a significant stake of Divi Divi LP.  He also falsely represented that, as limited partners, investors would receive a guaranteed annual return of 6% on their investment that would come from the income generated by Divi Divi LP's properties.

46.     Mattson directed interested investors to work with his personal assistant to open self-directed IRA accounts at specific IRA custodians with which Mattson had established relationships.  Mattson and his personal assistant communicated with investors by email and telephone.  Mattson also directed the Divi Divi LP investors to wire money to the self-directed

IRA custodians, and he instructed the custodians to transfer the money to the Mattson Controlled Account.

47.     Mattson also provided defrauded investors who invested before 2016 with falsified Schedules A that purported to show their percentage ownership interest in Divi Divi LP.  These falsified documents listed several dozen investors as limited partners and identified the fractional interest that they each purportedly owned of Divi Divi LP, with the total adding up to 100%. In fact, the true Schedule A for Divi Divi LP maintained by Home Tax only listed 19 real limited partners at its peak, and never included any of the defrauded investors.

48.     Because the ownership interests could not add up to more than 100%, Mattson eventually ran out of fractional interests that he could pretend to assign to new Divi Divi LP investors.  Starting in 2016, Mattson directed investors to work with a new self-directed IRA custodian, and, at the same time, he stopped sending falsified Schedules A to new Divi Divi LP investors.  Those new investors were not told what percentages of Divi Divi LP they were supposedly buying with their investments.

49.     In an effort to deceive the defrauded investors, also starting in 2016, Mattson knowingly or recklessly provided the new self-directed IRA custodian, which is based outside of California, with an altered version of the Divi Divi LP limited partnership agreement that omitted the signatures of the true Divi Divi LP limited partners.  The custodian then provided the altered agreement to investors, who had to sign the agreement as part of their account-opening and investing process.  In turn, the custodian returned the signed altered agreements to Mattson and his personal assistant.

50.     Certain defrauded Divi Divi LP investors over age 72 were required by law to take minimum distributions from their IRAs.  For those investors, Mattson wired money every month from the Mattson Controlled Account to the self-directed IRA custodians with instructions to distribute the money to the particular investors.  The source of the funds used to pay distributions to defrauded investors included new investor money commingled with other funds in the Mattson Controlled Account.  Other defrauded Divi Divi LP investors, who did not take distributions, were

told that their putative 6% return on investment "rolled over" into their initial investments, which increased the value of their investments on paper.

51.     Mattson did not record any of his purported sales of Divi Divi LP interests to the defrauded investors in LeFever Mattson's books and records or report them to Home Tax.  He therefore knew, or was reckless in not knowing, that none of the defrauded Divi Divi LP investors ever actually purchased Divi Divi LP interests or became limited partners in Divi Divi LP.

52.     As of April 2024, LeFever Mattson estimated that the total value of Divi Divi LP's real estate assets was $34 million, which represents an increase over time.  However, as noted above, over the years Mattson collected from defrauded investors more than $55 million, an amount that well exceeded the value of Divi Divi LP.

### C.    Mattson Made Materially False and Misleading Statements to Investors

53.     In both versions of his scheme, Mattson made numerous materially false and misleading statements to defrauded investors, including the following:  Mattson falsely told the defrauded investors that they were purchasing interests, from LeFever Mattson, in certain LeFever Mattson-affiliated limited partnerships that were created and managed by LeFever Mattson, and he omitted to tell investors that, in fact, their investments would be commingled with other funds and used to make Ponzi-like payments to prior investors.  Mattson directed many defrauded investors to sign limited partnership agreements and transfer agreements, both of which purported to specify the rights and obligations of the defrauded investors.  But Mattson did not inform Home Tax of his purported sales to the defrauded investors, and the defrauded investors therefore were not listed on the appropriate Schedules A.  As a result, the defrauded investors never became partners in the LeFever Mattson-affiliated limited partnerships they believed they were investing in, and they never owned any interests in those limited partnerships.

54.     Mattson also misrepresented to investors that they would receive a 6% to 8% distribution from the LeFever Mattson-affiliated limited partnership they believed they were investing in.  But these investors, who were not recorded as real limited partners, never received a legitimate distribution from a LeFever Mattson-affiliated limited partnership, because legitimate distributions were only made with funds from the trust account in the name of the specific limited

partnership and were made by representatives of Home Tax. Instead, Mattson sent certain
investors Ponzi-like payments from the Mattson Controlled Account that came from new
investments by defrauded investors commingled with other funds. For certain other investors in
the Divi Divi LP, Mattson did not send Ponzi-like payments, but instead provided quarterly
statements showing the purported increase in value of their investments on paper.

55.    Mattson was the maker of the false and misleading statements to the defrauded
investors. He personally made verbal misrepresentations to investors. Additionally, he was the
maker of the false and misleading statements in the limited partnership agreements and related
documents that he provided to investors, which purported to reflect sales from LeFever Mattson to
the investors. He also sent falsified and altered documents concerning Divi Divi LP to self-
directed IRA custodians even though he knew, or was reckless in not knowing, that the custodians
were providing those documents to investors.

56.    Mattson's false and misleading representations about Divi Divi LP and other
LeFever Mattson-affiliated limited partnerships were material to a reasonable investor, as well as
the actual defrauded investors who bought the fake limited partnership interests. It was important
to investors that they were acquiring ownership interests in specific LeFever Mattson-affiliated
limited partnerships, and that they were thus entitled to distributions from those limited
partnerships. Because the limited partnerships owned real estate, they had a source of income and
could make reliable distributions. The fake or altered investment documents and false Schedule
K-1 documents were also important to investors because they appeared to confirm that the
investors did in fact own interests in the limited partnerships.

**D.    Mattson Acted with Scienter in Carrying Out His Scheme**

57.    Mattson's scheme to offer and sell the fake interests in the LeFever Mattson-
affiliated limited partnerships was conducted knowingly or recklessly by Mattson.

58.    With respect to Mattson's offers and sales, Mattson acted with scienter in
representing to investors that their signature on limited partnership agreements and transfer
agreements and payment of money would purchase interests in LeFever Mattson-affiliated limited
partnerships, because he knew, or was reckless in not knowing, that the defrauded investors'

purported interests were not being recorded in the relevant books and records and that the

defrauded investors were not becoming true limited partners.

59.    Moreover, Mattson knew, or was reckless in not knowing, that the false Schedules

K-1 provided to the defrauded investors were not legitimate in light of his role in reviewing and

signing the true tax forms filed with the IRS by the LeFever Mattson-affiliated limited

partnerships.

60.    With respect to Mattson's offers and sales through self-directed IRA custodians,

Mattson acted with scienter in falsely representing to investors that their completion of paperwork

with a self-directed IRA custodian, including their signature on an altered version of the Divi Divi

LP limited partnership agreement and payment of money, would purchase interests in Divi Divi

LP, because he knew, or was reckless in not knowing, that the defrauded investors' purported

interests were not being recorded in the relevant books and records and that the defrauded investors

were not becoming true limited partners.

61.    Mattson further knew, or was reckless in not knowing, that his representation that

investors would receive a distribution from the LeFever Mattson-affiliated limited partnerships

was false and misleading because Mattson was paying defrauded investors purported distributions

using new investor money commingled with other funds in the Mattson Controlled Account.

62.    In addition, in February 2024, prior to his resignation, Mattson signed an indemnity

agreement with LeFever Mattson in which he agreed to indemnify LeFever Mattson for claims

related to "Third Party Transactions," which was defined in the agreement as "numerous

transactions with individuals and/or entities pursuant to which Indemnitor has secured funds on

terms and conditions not clearly documented."  The agreement further stated, among other things,

that "none of the Third Party Transactions were presented to the Board or shareholders of LeFever

Mattson prior to the date that the Third Party Transactions were entered into"; "none of the Third

Party Transactions were authorized or approved by the Board or shareholders of LeFever Mattson

at any time prior to or after the date that the Third Party Transactions were entered into"; and

neither Mattson's business partner nor "LeFever Mattson received any benefit, directly or

indirectly, economic or otherwise, in connection with or as a result of the Third Party Transactions."

**E.    Mattson Perpetuated and Concealed His Fraud by Using the Mattson Controlled Account**

63.    To facilitate his schemes, Mattson used the Mattson Controlled Account, which he opened in the name of LeFever Mattson.  Until April 2024, Mattson was the only person who controlled the Mattson Controlled Account and could access its statements, which were mailed to Mattson's personal post office box per his instruction.

64.    Mattson used the Mattson Controlled Account to receive wire transfers and deposit checks from the defrauded investors and to pay them purported distributions from LeFever Mattson-affiliated limited partnerships.  Defrauded investors sent more than $46 million to the Mattson Controlled Account between January 2020 and March 2024.

65.    Mattson sent out hundreds of checks each month through the mail from the Mattson Controlled Account to defrauded investors that contained the memo-line notation "Owner WD [withdrawal]," as well as the name of the limited partnership that was supposedly paying the distribution.  Mattson knew, or was reckless in not knowing, that these memo-line statements were false and misleading because legitimate distributions from any LeFever Mattson-affiliated limited partnership were only paid from the trust account in the limited partnership's name, and were exclusively handled by employees of Home Tax.

66.    Images of the checks that Mattson sent to defrauded investors show that he used commercial bookkeeping software to generate the checks.

67.    In around early-May 2024, Mattson received an investigative subpoena from the staff of the Commission's Division of Enforcement that required him to produce certain records, including documents and communications related to his purported offers and sales of interests in Divi Divi LP and other LeFever Mattson-affiliated limited partnerships.

68.    Subsequently, in late May 2024, federal criminal authorities executed a judicially authorized search warrant and seized, among other things, a laptop belonging to Mattson.

69.     A forensic analysis of the laptop conducted by federal criminal authorities revealed that in May 2024, after Mattson received the Commission's subpoena, Mattson deleted from his laptop certain commercial bookkeeping software as well as hundreds of files, including ones with file names that contained the names of defrauded investors as well as Divi Divi LP and other LeFever Mattson-affiliated limited partnerships.

**F.      Mattson's Misuse and Misappropriation of Investor Funds**

70.     Mattson misappropriated millions of dollars of defrauded-investor funds for his own purposes, and to pay for the expenses of KS Mattson Partners.

71.     Mattson commingled new investments from defrauded investors in the Mattson Controlled Account with money from other sources, including proceeds from real estate sales, distributions received based on LeFever Mattson's legitimate ownership interests in the LeFever Mattson-affiliated limited partnerships, and transfers from a bank account in the name of KS Mattson Partners.

72.     Mattson used these commingled funds to make approximately $2.1 million in payments against multiple personal loans collateralized by properties including his primary and non-primary residences, and to pay for approximately $4.2 million in credit card bills for accounts in his name, among other personal expenses.  He also spent approximately $9.9 million from the Mattson Controlled Account to buy real estate in the name of KS Mattson Partners.  In addition, he paid approximately $13 million of interest on several high-interest loans that he had taken out to purchase other real estate properties in the name of KS Mattson Partners.

73.     KS Mattson Partners had no legitimate claim to the ill-gotten funds of the defrauded investors, who were told by Mattson that they were investing in particular LeFever Mattson-affiliated limited partnerships and were not told that their funds would be used to pay for KS Mattson Partners' investments and expenses.

74.     Mattson did not disclose these expenditures to the defrauded investors, who believed, based on Mattson's material misrepresentations, that they were investing in specific LeFever Mattson-affiliated limited partnerships.  Mattson's failure to disclose his intention to misappropriate investment funds, and past practice of doing so, was material to a reasonable

investor, as well as the actual defrauded investors who bought the fake limited partnership interests.  It was important to investors to know that the money they were sending Mattson was in fact being used to purchase the promised limited partnership interests, rather than to pay existing investors; buy properties and pay expenses for Mattson's personal entity, KS Mattson Partners; or pay for certain of Mattson's other personal expenses.

### G.    The Registration Violations

75.    The LeFever Mattson-affiliated limited partnership interests that Mattson offered and sold to the defrauded investors were securities.

76.    No registration statements were filed with the Commission for the LeFever Mattson-affiliated limited partnership interests that Mattson offered and sold to defrauded investors and none of the exceptions to the registration requirements applied to the offering.

77.    Mattson directly participated in the offer of the LeFever Mattson-affiliated limited partnership interests to the defrauded investors by holding in-person meetings with the defrauded investors.

78.    Mattson also had the defrauded investors sign limited partnership agreements for a particular LeFever Mattson-affiliated limited partnership and other investment related documents.

79.    Mattson additionally gave the defrauded investors instructions on how to transfer the funds needed to invest in the limited partnerships and encouraged many defrauded investors to use their IRA retirement money to invest in the limited partnerships.

80.    Defrauded investors sent Mattson money in the belief that they were purchasing LeFever Mattson-affiliated limited partnership interests from Mattson.

81.    Mattson led the defrauded investors to believe that by investing in the LeFever Mattson-affiliated limited partnerships they were investing in a common enterprise and that their fortunes were linked to the fortunes of Mattson and LeFever Mattson, who often also owned interests in the limited partnerships.

82.    The money invested by the defrauded investors was pooled together and commingled in the Mattson Controlled Account and used by Mattson to pay existing defrauded investors as part of his Ponzi-like scheme, among other expenses.

83.     The defrauded investors passively received distributions and did not manage, or expect to participate in the management of, the LeFever Mattson-affiliated limited partnerships. Indeed, Mattson led the defrauded investors to believe they would earn profits based solely on the efforts of Mattson, LeFever Mattson, and others, who would use their expertise to choose real estate investments and manage acquired properties, which would result in profits for the defrauded investors derived from rents or real estate transactions.

84.     Mattson engaged in a general solicitation of investors by offering the LeFever Mattson-affiliated limited partnerships interests to individuals located throughout the United States and by offering the limited partnership interests to individuals with whom Mattson had no pre-existing substantive relationship.

85.     Mattson failed to take reasonable steps to verify that the defrauded investors he offered the limited partnership interests to were accredited investors.  For instance, Mattson did not require the defrauded investors to provide any IRS forms reporting the investors' income, bank statements, brokerage statements, certificates of deposit information, tax assessments, or appraisal reports issued by an independent third party to verify their accredited status.

**FIRST CLAIM FOR RELIEF (Mattson Only)**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

86.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 85.

87.     Mattson, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, or of the facilities of a national securities exchange, with scienter:

          a.   Employed devices, schemes, or artifices to defraud;

          b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

      c.  Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

88.    By reason of the foregoing, Mattson violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF (Mattson Only)**

*Violations of Section 17(a) of the Securities Act*

89.    The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 85.

90.    Mattson, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

      a.  with scienter, employed devices, schemes, or artifices to defraud;

      b.  obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

91.    By reason of the foregoing, Mattson violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF (Mattson Only)**

*Violations of Sections 5(a) and 5(c) of the Securities Act*

92.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 85.

93.     The LeFever Mattson-affiliated limited partnership interests offered and sold by Mattson are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 77c(a)(10)].

94.     By engaging in the conduct described above, Mattson, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities through the use or medium of any prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

95.     By reason of the foregoing, Mattson violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**FOURTH CLAIM FOR RELIEF (KS Mattson Partners Only)**

*Relief Defendant – Unjust Enrichment*

96.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 95.

97.     As described above, Mattson engaged in a scheme to defraud investors in connection with the offer, purchase, or sale of interests in the LeFever Mattson-affiliated limited partnerships and to use the money raised to unjustly enrich himself and Relief Defendant KS Mattson Partners.

98.     KS Mattson Partners has no legitimate claim to the funds, property, and benefits described above, and has thus been unjustly enriched under circumstances in which it is not just, equitable, or conscionable for it to retain such profits.

99.    By reason of the foregoing, it would be inequitable for KS Mattson Partners to retain the proceeds resulting from Mattson's violations of the federal securities laws and such proceeds should be disgorged.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter an order permanently enjoining Mattson from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### II.

Enter an order permanently enjoining Mattson from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such an injunction shall not prevent Mattson from purchasing or selling securities for his own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

### III.

Enter an order permanently barring Mattson from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### IV.

Enter an order requiring Mattson to disgorge all ill-gotten gains received as a result of his unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Enter an order requiring Mattson to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**VI.**

Enter an order requiring KS Mattson Partners to disgorge the ill-gotten gains or unjust enrichment it obtained or derived from Mattson's unlawful conduct, together with prejudgment interest on all such amounts.

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VIII.**

Grant such other and further relief as this Court may determine to be just and necessary.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38 and L.R. 3-6, the Commission demands a trial by jury on all issues so triable.

Dated:  May 22, 2025                    Respectfully submitted,


   */s/ Duncan C. Simpson LaGoy*
Duncan C. Simpson LaGoy
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION